## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| JENNY BROWN | Complaint – Class Action |
| | JURY DEMAND |
| Plaintiff, | |
| | |
| v. | Case No. _____ |
| | |
| ENCORE CAPITAL GROUP, INC., | |
| MIDLAND FUNDING, LLC, | |
| MIDLAND CREDIT MANAGEMENT, INC., | |
| HOSTO, BUCHAN & PRATER, PLLC | |
| | |
| Defendants. | |

## ORIGINAL CLASS ACTION COMPLAINT

### NATURE OF ACTION

1.     This is class action brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

3.     Venue is proper before this Court pursuant to 28 U.S.C. §1391(b), where the acts and transactions giving rise to this action occurred in this State and this district, where the plaintiff resides in this State and this district, and where the defendants transact business in this State and this district.

1

## PARTIES

4.     Plaintiff Jenny Brown (Cox) ("Plaintiff") is a natural person who at all relevant times resided in the State of Tennessee, County of Shelby.

5.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

6.     Encore Capital Group, Inc. ("Encore") is a publicly traded Delaware corporation with principal executive offices situated at 8875 Aero Drive, Suite 200, San Diego, California.  Encore's common-stock is registered pursuant to Section 12(b) of the Securities and Exchange Act of 1934 and is listed on the NASDAQ Global Select Market under the symbol "ECPG."

7.     Encore is engaged in the business of purchasing and collecting delinquent debts originally owed to third parties.

8.     Encore, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

9.     Encore is "debt collector" as defined by 15 U.S.C. § 1692a(6).[1]

10.     Midland Funding, LLC, and Midland Credit Management, Inc., are under common control and ownership.  Both are owned and controlled by Encore.

11.     Defendant Midland Funding, LLC ("Midland Funding") is a Delaware corporation, with its principal place of business in San Diego, California.  Midland

---

[1] *See e.g. Herket v. MRC Receivables Corp.*, 655 F. Supp. 2d 870, 880 (N.D. Ill. 2009) (Encore Capital Group, Inc. is a debt collector); *See also  Miller v. Midland Credit Mgmt., Inc*., 621 F.Supp.2d 621, 634-35 (N.D.Ill.2009) (finding Encore to be a debt collector under the FDCPA); *Hernandez v. Midland Credit Mgmt., Inc*., No. 04 C 7844, 2007 WL 2874059, at *14-16 (N.D. Ill. Sept. 25, 2007) (same).

Funding is a wholly owned subsidiary, and is under of the common control and ownership, of Encore.

12.    Midland Funding is engaged in the business of taking title to and collecting delinquent debts originally owed to third parties.

13.    Midland Funding, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

14.    MRC is "debt collector" as defined by 15 U.S.C. § 1692a(6).

15.    Defendant Midland Credit Management, Inc. ("MCM"), is a Kansas corporation with its principal place of business in San Diego, California.  MCM is a wholly owned subsidiary, and is under of the common control and ownership, of Encore.

16.    MCM is engaged in the business of collecting delinquent debts originally owed to third parties that are purchased by Encore and titled in the names of Midland Funding or other Encore subsidiaries.

17.    MCM, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

18.    MCM is "debt collector" as defined by 15 U.S.C. § 1692a(6).

19.    Defendant Hosto, Buchan & Prater, PLLC ("HBP") is a foreign limited liability corporation formed under the laws of Arkansas with its principal office situated at:  701 W. 7th St., Little Rock, AR 72201.  HBP may be served by and through its registered agent:  Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203.

20.     HBP is in the business of collecting delinquent debts originally owed to third parties that are purchased by Encore, titled in the names of Midland Funding or other Encore subsidiaries, and placed with MCM for collection.

21.     HBP, at all relevant times, was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C. §1692a(5).

22.     HBP is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

23.     Encore, Midland Funding, MCM, and HBP act jointly and in concert to collect consumer debts incurred primarily for personal, family or household purposes, and acted jointly and in concert to collect an alleged consumer debt from Plaintiff which debt was incurred by Plaintiff for personal, family or household purposes.

24.     Encore, Midland Funding, and MCM, by virtue of their status as "debt collectors", are vicariously liable for the debt collection activity of HBP — the debt collector  hired to collect debts on their behalf.  *See Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. Pa. 2000); *McCorriston v. L.W.T., Inc*., 2008 U.S. Dist. LEXIS 60006, 11-12 (M.D. Fla. Aug. 7, 2008); *Schutz v. Arrow Fin. Servs., LLC*, 465 F. Supp. 2d 872, 876 (N.D. Ill. 2006); *Cox v. Hilco Receivables, L.L.C*., 726 F. Supp. 2d 659, 667-68 (N.D. Tex. 2010).

## FACTUAL ALLEGATIONS

## I.     THE ENCORE DEBT COLLECTION ENTERPRISE.

25.     Encore secures funds from investors and lenders for the purpose of purchasing portfolios of charged-off consumer receivables to which Midland Funding takes title.  Midland Funding places charged-off accounts with MCM for collection pursuant to a Servicing Agreement.  MCM places charged-off accounts with HBP for

collection pursuant to a contract for consumer debt collection services between Midland Funding and HBP ("Collection Agreement").  HBP causes letters to be sent and files lawsuits during the course of attempting to collect upon these accounts.

26.    Encore purchases portfolios of defaulted consumer receivables and manages their collection through its subsidiary entities.   Encore purchases deeply discounted charged-off consumer receivable portfolios from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios.

27.    From its inception through June 30, 2009, Encore has invested approximately $1.3 billion to acquire 27 million consumer accounts with a face value of approximately $43 billion.

28.    During the three months ended September 30, 2010, Encore purchased receivable portfolios with a face value of $2.6 billion for $77.9 million, or a purchase cost of 3.0% of face value.  Encore's estimated future collections at acquisition for these portfolios amounted to $166.2 million.  Exhibit "B" (Encore Form 10Q, filed October 26, 2010).

29.    MCM has a net worth exceeding $50,000,000.00.  *See e.g. Sadler II v. Midland Credit Management, Inc. et al.*, No. 1:06-cv-05045 (N.D. Ill.) (Document 34-4 at 7).

A.    **Portfolio Acquisitions.**

30.    Encore raises capital to acquire portfolios of accounts at deep discounts from their face value using a sophisticated valuation process that is based on the attributes of the underlying accounts.

5

31.    Acquisitions of receivable portfolios are financed by operations and by borrowings from third parties.

32.    Encore enters into Credit Agreements with third party financial lending institutions such as JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank, N.A., and Citibank, N.A., pursuant to which revolving loans are made to Encore from time to time.  *See e.g.* Encore Form 8K, February 8, 2010 at Exhibit 10.1 ("Credit Agreement dated as of February 8, 2010 by and among Encore Capital Group, Inc., the Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as administrative agent.").

33.    Once a receivable portfolio has been identified for potential purchase, Encore prepares quantitative analyses based on extracting customer level data from external sources, other than the issuer, to analyze the potential collectibility of the portfolio.   Encore also analyzes the portfolio by comparing it to similar portfolios previously acquired and serviced by Encore and its subsidiaries.

34.    Members of Encore's senior management, including key officers, materially control and participate in the acquisition and collection of portfolios of charged-off consumer receivables.

> Our management team has considerable experience in finance, banking, consumer collections and other industries. We believe that the expertise of our executives obtained by managing businesses across numerous other industries has been critical to the enhancement of our operations. Our management team has created a culture of new ideas and progressive thinking, coupled with increased use of technology and statistical analysis. The loss of the services of one or more of our key executive officers could disrupt our operations and seriously impair our ability to continue to acquire or collect on portfolios of charged-off consumer receivables and to manage and expand our

6

> business. Our success depends on the continued service and
> performance of our management team, and we cannot
> guarantee that we will be able to retain such individuals.

(Encore Form 10−Q, filed October 26, 2010).

35.     Members of Encore's management perform qualitative analyses of other matters affecting the value of portfolios, including a review of the delinquency, charge off, placement and recovery policies of the originator as well as the collection authority granted by the originator to any third party collection agencies, and, if possible, by reviewing their recovery efforts on the particular portfolio.  Exhibit "C" (Encore Form 10K, 2001).

36.     After these evaluations are completed, Encore's Investment Committee, comprised of various members of our senior management, discusses the findings, decides whether to purchase and finalizes the price at which we are willing to purchase the portfolio.  Exhibit "C" (Encore Form 10K, 2001).

37.     Title to the purchased portfolios is taken and held by Encore's indirect subsidiaries such as Midland Funding or another Encore subsidiary such as NCC-2 Corp., or MRC Receivables Corp.

38.     Midland Funding is referred to as a debt-owning company within the Encore family of businesses.

**B.     Dynamic Portfolio Collection Strategies.**

39.     Encore employs a "dynamic collections approach" under which it re-analyzes all of its accounts once each quarter with refreshed external data, which it supplements with information gleaned from its own collection efforts.  Encore modifies its collection method for each account if warranted.

40.     Encore's proprietary consumer level collectability analysis is the primary determinant of whether an account is actively worked post-purchase. Throughout Encore's ownership period, it continuously refines this analysis to determine the most effective collection strategy to pursue for each account. These strategies consist of:

- outbound calling, driven by proprietary predictive software, by our own collection workforce located at our three domestic call centers and an international call center, through a majority-owned joint venture, in India;

- the use of a nationwide network of collection attorneys to pursue legal action where appropriate;

- the use of multiple third party collection agencies;

- direct mail campaigns coordinated by our in-house marketing group;

- the transfer of accounts to a credit card provider, generating a payment to us; and

- the sale of accounts where appropriate.

41.     Once receivables are ready to be worked, members of the Information Technology Department work directly with the head of Operations to discuss the specifics of the recent acquisition.  These discussions are useful because they allow the Information Technology Department to tailor Encore's proprietary account management system to reflect any special characteristics of the portfolio and Encore's collection strategy.  Exhibit "C" (Encore Current Report on Form 10K, for 2001).

42.     Pursuant to a Servicing Agreement by and among MRC Receivables Corporation, MCM, and CFSC Capital Corp. VIII, a Delaware corporation, MCM is responsible for managing and servicing the collection of the debts owned by Encore's debt-owning entities such as Midland Funding.  *See* Exhibit "D" (Servicing Agreement relating to the Secured Financing Facility, dated as of December 20, 2000 (incorporated

8

by reference to Exhibit 10.8 to Encore's Current Report on Form 8-K filed on August 22, 2003)).

43.   MCM is referred to as a servicer within the Encore family of businesses.

44.   MCM only services and collects on the accounts to which Midland Funding takes title.

45.   The Servicing Agreement grants MCM significant power and authority to conduct and manage the collection of the accounts to which Midland Funding holds title, including, without limitation, the commencement of legal proceedings in Midland Funding's name to collect accounts.  Exhibit "D" at Section 2.5.

**C.   Legal Outsourcing Collection Channel.**

46.   Encore's outsourced legal collections channel is comprised of more than 75 vendor relationships, delivers over $250 million in annual collections and is supported by approximately 50 team members.

47.   Pursuant to certain written Collection Agreements between MCM and various law firms ("Firms"), Encore generally outsources those accounts where it appears the debtor is able, but is unwilling to pay.

48.   This process is managed by Encore's Legal Outsourcing Department.

49.   Pursuant to such Collection Agreements, Encore places accounts with the Firms from time to time for collection.

50.   The Collection Agreements control the manner in which the Firms must conduct collection activities on behalf of MCM in connection with the accounts purchased by Encore to which Midland Funding holds title.

51.     Specifically, the Collection Agreements require the Firms to abide by, and conduct all of their activities in a manner consistent with the then current "Procedures", which the Collection Agreement defines as "the Midland Account Handling Procedures, a copy of which is attached to this Agreement as Exhibit "E" and incorporated herein by this reference, which procedures may be modified by MCM from time-to-time in its sole and absolute discretion."

52.     MCM is required to provide advance notice of any modification of the Procedures to the Firms.

53.     The Collection Agreements contain bilateral indemnification provisions that allocate financial liability arising out of the Firms' collection efforts between Encore and the Firms.

54.     Midland Funding and Encore are named as third-party beneficiaries of the Collection Agreements.

55.     The Collection Agreements provide for MCM's exercise of material control over each aspect of the Firms' collection efforts.

56.     The Collection Agreements confer upon MCM the right to conduct audits without notice at the expense of the Firms.

57.     The Collection Agreements require the Firms to obtain and provide proof of insurance policies to MCM.  The Firms are required to name MCM as loss payee in such policies.

58.     The Collection Agreements contain stringent daily reporting requirements pursuant to which the Firms make daily reports consisting of all information regarding any activity that occurs during that work day on any account received by the firm from

MCM, including but not limited to, communications or attempted communications between the Firms and consumers and/or others.

59.     The Firms must also utilize MCM's Daily Invoicing Report, as part of its confirmation process relating to the successful upload of activity and payments, to confirm that those amounts the Firm believes were transmitted to MCM were received by MCM as part of each daily upload.

60.      The Firms must also maintain or acquire technology and resources sufficient to communicate and transmit and receive data with MCM in connection with the accounts placed with the firm.

61.     MCM issues user IDs and passwords to the Firms for the purpose of providing access to MCM's website and computer collections software and its information databases.

62.     Section 2.4.5 of the Collection Agreements require the Firms to maintain true, complete and accurate records, instruments, agreements, correspondence and other documentation, irrespective of the medium held, received or generated for a period of seven (7) years on all matters and activities:  (i) related to or arising in connection with each account; and (ii) arising out of or relating to the Collection Agreements.

63.     MCM has created a "Legal Outsourcing Firm Training Manual," which it has provided to various law firms collecting debts pursuant to the Collection Agreements. *See e.g. Midland Funding, LLC v. Mansfield*, No. 3:09-cv-00358-L (D. Ariz.) at Document No. 60-2, pages 41-44 (Legal Outsourcing Firm Training Manual).

11

64.     Encore manages and exercises control over each aspect of the collection process including legal outsourcing.  *See e.g.* Exhibit "A" (Encore Presentation, William Blair 4th Annual Emerging Growth Stock Conference, October 5, 2010).

65.     Encore's management is responsible for setting the strategic direction, managing all legal outsourcing operations and personnel, driving process improvements, managing the P&L, and for ensuring that Encore's suppliers/vendors are competitive.

66.     Encore's Head of Legal Outsourcing oversees all Legal Outsourcing teams across the company, providing essential leadership and staff development consistent with overall company objectives and goals.

67.     Encore's or MCM's Director of Legal Outsourcing and Manager of Legal Outsourcing monitor and control the day-to-day operations of the Firms collecting MRC's accounts on behalf of MCM pursuant to the Collection Agreements.

68.     Through MCM, Encore advances certain out-of-pocket court costs such as filing fees.   Encore capitalizes these costs in its consolidated financial statements. Encore pays a fee to the respective attorneys based on an established fee schedule, as further defined in the Collection Agreements executed by the collection channel law firms and MCM on Encore's behalf.  Exhibit "C" (Encore Form 10K, 2001).

69.     The cost of Encore's legal collections was $33.9 million during the three months ended September 30, 2010.   These costs represent contingent fees paid to Encore's nationwide network of attorneys and costs of litigation.

70.     HBP is a law firm that represents Midland Funding under contract with MCM.

71.     Upon information and belief, MCM placed Plaintiff's account with HBP pursuant to a Collection Agreement between MCM and HBP.

## II.     HBP'S ATTEMPTS TO COLLECT A DEBT FROM PLAINTIFF.

72.     Plaintiff is a natural person obligated, or allegedly obligated, to pay a debt owed or due, or asserted to be owed or due an original creditor other than Defendants; namely, CitiFinancial.

73.     HBP uses instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

74.     Plaintiff's obligation, or alleged obligation, owed or due, or asserted to be owed or due an original creditor other than HBP, arises from a transaction or transactions in which the money, property, insurance, and/or services that are the subject of the transaction(s) were incurred primarily for personal, family, or household purposes.

75.     On or about February 24, 2011, HBP printed and mailed, or caused to be printed and mailed, a letter a letter to Plaintiff in and effort to collect from Plaintiff an obligation, or alleged obligation, owed or due, or asserted to be owed or due an original creditor other than HBP ("Letter").   A true and correct copy of the Letter is attached hereto as exhibit "F".

76.     In relevant part the Letter states:

> This is an attempt to collect a debt.   Any information obtained will be used for that purpose.   Unless you notify us within 30 days of your receipt of this letter that the validity of this debt, or any portion of it, is disputed, we will assume that it is valid.   **If you notify us within 30 days of your receipt of this letter of a dispute, we will**

> **send you verification of the debt.** Upon your written request within 30 days of your receipt of this letter, we will send you the name and address of the original creditor if different from the current creditor.

Exhibit "F" (emphasis added).

77. The Letter represents HBP's initial written communication to Plaintiff.

78. The Letter fails to provide the disclosures required by 15 U.S.C. § 1692g(a)(4), and HBP failed to provide Plaintiff with such disclosure within five (5) days thereafter.

79. HBP as a matter of pattern and practice, mails or sends, or causes to be mailed or sent, communications to alleged debtors using language substantially similar or materially identical to that utilized by HBP in mailing, or causing to be mailed, the Letter to Plaintiff, and as a matter of pattern and practice fails to provide the disclosures required by 15 U.S.C. § 1692g(a)(4), within five (5) days thereafter.

80. The Letter is a standardized form letter which, upon information and belief, was sent over the course of the past year by Defendant to at least 200 consumers residing in Tennessee.

81. The Letter, and each substantially similar or materially identical letter mailed to each member of the proposed class, is a product of mail is a product of Defendants' concerted efforts and integrated or shared technologies including computer programs, mailing houses, and electronic databases.

## CLASS ALLEGATIONS

82. Plaintiff brings this action on behalf of herself and all others similarly situated. Specifically, Plaintiff seeks to represent a class of individuals defined as:

> All persons located in Tennessee who, within one year before the date of the original complaint, received a letter on Hosto, Buchan & Prater, PLLC, letterhead which identifies Midland Funding, LLC, as the current creditor, where such communication was substantially similar or materially identical to the February 24, 2011, letter received by Plaintiff.

83.     The proposed class specifically excludes the United States of America, the states of the Sixth Circuit, counsel for the parties, the presiding United States District Court Judge, the Judges of the United States Court of Appeals for the Sixth Circuit and the Justices of The United States Supreme Court, all officers and agents of Defendants and all persons related to within the third degree of consanguinity or affection to any of the foregoing individuals.

84.     The class is averred to be so numerous that joinder of members is impracticable.

85.     The exact number of class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery.

86.     The class is ascertainable in that the names and addresses of all class members can be identified in business records maintained by Defendant.

87.     There exists a well-defined community of interest in the questions of law and fact involved that affect the parties to be represented.  These common questions of law and fact predominate over questions that may affect individual class members.  Such issues include, but are not limited to: (a) The existence of HBP's identical conduct particular to the matters at issue; (b) HBP's violations of 15 U.S.C. §1692 *et. seq.*; and (c) The availability of statutory penalties; and (d) Attorney's fees and costs.

88.     The claims of Plaintiff are typical of those of the class she seeks to represent.

89.     The claims of Plaintiff and of the class originate from the same conduct, practice, and procedure, on the part of HBP.   Thus, if brought and prosecuted individually, the claims of each class member would require proof of the same material and substantive facts.

90.     Plaintiff possesses the same interests and has suffered the same injuries as each class member.   Plaintiff asserts identical claims and seeks identical relief on behalf of the unnamed class members.

91.     Plaintiff will fairly and adequately protect the interests of the class and has no interest adverse to or which directly and irrevocably conflicts with the interests of other members of the class.

92.     Plaintiff is willing and prepared to serve this Court and proposed class.

93.     The interests of Plaintiff are co-extensive with and not antagonistic to those of the absent class members.

94.     Plaintiff has retained the services of counsel who are experienced in consumer protection claims, as well as complex class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent Plaintiff and all absent class members.

95.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).   The prosecution of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class

who are not parties to the action or could substantially impair or impede their ability to protect their interests.

96.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the parties opposing the class.   Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the class.

97.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that HBP has acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

98.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the class predominate over any questions affecting only individual members.

99.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that: (a) individual claims by the class members will be impracticable as the costs of pursuit would far exceed what any one plaintiff or class member has at stake; (b) as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions; (c) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy.

## COUNT I: VIOLATION OF FAIR DEBT COLLECTION
## PRACTICES ACT § 1692g(a)(4)

100.    Plaintiff repeats and re-alleges each and every allegation contained in

paragraphs 1 through 100.

101.    The FDCPA at section 1692g(a) provides:

(a) Within five days after the initial communication with a
consumer in connection with the collection of any debt, a
debt collector shall, unless the following information is
contained in the initial communication or the consumer has
paid the debt, send the consumer a written notice contain-
ing —

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days
after receipt of the notice, disputes the validity of the debt,
or any portion thereof, the debt will be assumed to be valid
by the debt collector;

(4) a statement that if the consumer notifies the debt col-
lector in writing within the thirty-day period that the debt,
or any portion thereof, is disputed, the debt collector will
obtain verification of the debt or a copy of a judgment
against the consumer and a copy of such verification or
judgment will be mailed to the consumer by the debt
collector; and

(5) a statement that, upon the consumer's written request
within the thirty-day period, the debt collector will provide
the consumer with the name and address of the original
creditor, if different from the current creditor.

15 U.S.C. § 1692g(a).

102.    HBP violated 15 U.S.C. § 1692g by failing to disclose in the Letter, or

within five days thereafter, the information required by 15 U.S.C. § 1692g(a)(4); namely,

that to be obtain verification of the alleged debt, Plaintiff must dispute it in writing.

18

103.   "Every district court to consider the issue has held that a debt collector violates §1692g(a) by failing to inform consumers that requests under subsections (a)(4) and (a)(5) must be made in writing.   The reasoning of these courts is persuasive." *Osborn v. Ekpsz, LLC*, CIV.A. H-10-2252, 2011 WL 4479108 at *8 (S.D. Tex. Sept. 26, 2011) (collecting cases, internal citation omitted).

104.   Defendant's omission would reasonably lead the least sophisticated consumer to believe, erroneously, that a verbal dispute of the debt will protect her rights in obtaining verification.   See *Grief v. Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, 217 F. Supp. 2d 336, 340-41 (E.D.N.Y. 2002) ("Any consumer, not simply the least sophisticated consumer, who read this letter would not know that to secure her right to obtain verification of the debt and the identity of the original creditor, her dispute of the debt and request for the identity of the original creditor must be in writing."); *see also Nero v. Law Office of Sam Streeter, PLLC*, 655 F. Supp. 2d 200, 206 (E.D.N.Y. 2009) (same); *Welker v. Law Office of Daniel J. Horwitz*, 699 F.Supp.2d 1164 (S.D. Cal. 2010) ("Accordingly, there can be no dispute Defendant violated the FDCPA insofar as its dunning letter failed to advise [the plaintiff] that to be entitled to a verification of the debt under subsection (a)(4) or to obtain the name and address of the original creditor under subsection (a)(5) the request had to be in writing.").

105.   "The least sophisticated consumer could certainly interpret Defendants' letter to Plaintiff to mean that she would obtain verification of the debt or the identity of the original creditor by contacting Defendants' at the telephone number provided. Without a statement that these requests must be in writing, the least sophisticated consumer is not simply uncertain of her rights under the statute, she is completely

unaware of them." *Grief*, 217 F. Supp. 2d 336, 340-41 (E.D.N.Y. 2002).   In addition, a consumer who is not informed of the writing requirements would be unable to avail herself of the protections afforded by Section 1692g(b).  For example, if debt collector does not inform the consumer that a debt dispute must be in writing, the consumer could dispute the debt during a telephone call to the debt collector, but the debt collector would not be required to cease its collection efforts and the consumer would not benefit from the protections afforded by the FDCPA.  *See Id.*

106.   HBP violated 15 U.S.C. § 1692g by failing to disclose in the Letter, or within five days thereafter, the information required by 15 U.S.C. § 1692g(a)(4).

107.   Because Encore, Midland Funding, and MCM, are themselves debt collectors who hired HBP to collect their debt, they are vicariously liable to Plaintiff for HBP's violations of the FDCPA.  *Edwards v. Velocity Investments, LLC*, 1:10 CV 1798, 2011 WL 4007394 (N.D. Ohio Sept. 8, 2011) ("Upon review, the Court finds that, because Velocity is itself a debt collector, vicarious liability applies.") (*citing Wadlington v. Credit Acceptance Corp*., 76 F.3d 103, 108 (6th Cir. 1996)).

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

b.   Adjudging that HBP violated 15 U.S.C. § 1692g;

c.   Adjudging that Encore, Midland Funding, and MCM are vicariously and jointly and severally liable for HBP's violations of 15 U.S.C. §

1692g;

d.   Awarding Plaintiff, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

e.   Awarding Plaintiff, and all those similarly situated, their reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

f.   Awarding Plaintiff, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

g.   Awarding such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

108.      Plaintiff is entitled to and hereby demands a trial by jury on all counts.

Dated: October 26, 2011.                    Respectfully submitted,

WEISBERG & MEYERS, LLC

By: /s/Craig Ehrlich
Craig Ehrlich
Attorney for Plaintiff
Weisberg & Meyers, LLC
1448 Madison Avenue
Memphis, TN 38104
Telephone: (602) 445 9819
Facsimile: (866) 565 1327
Email: CEhrlich@AttorneysForConsumers.com

21

***Please send correspondence to the address below***

Craig Ehrlich
Weisberg & Meyers, LLC
Attorneys for Plaintiff
5025 N. Central Ave. #602
Phoenix, AZ 85012

*Attorneys for Plaintiff* JENNY BROWN